## JOSE CORDONO V. THE STATE.

### No. 3983.  Decided May 19, 1909.

### Rehearing Granted, June 9, 1909.

**1.—Murder—First or Second Degree—Express and Implied Malice—Charge of Court.**

Where upon trial for murder the defendant plead guilty, and there was testimony raising the issue of murder in the second degree, the court should have charged correctly on both degrees of murder.

**2.—Same—Case Stated—Jealousy—Inadequate Cause.**

Upon trial for murder where there was evidence that the defendant killed the deceased in a sudden fit of jealousy, the court should have charged on murder in the second degree.

**3.—Same—Charge of Court—Murder in the Second Degree.**

Where upon trial for murder the court in his charge on murder in the second degree erroneously grouped the facts authorizing the jury to find implied malice, and also joined the same with immaterial issues not in evidence, the same was reversible error.

**4.—Same—Charge of Court—Grouping of Facts.**

Where upon trial for murder the court in his charge on murder in the second degree erroneously grouped the facts in evidence in favor of the lesser degree of murder, and confined defendants condition of mind to passion, inadequately engendered, upon anger and rage, when there was evidence that the defendant acted upon other inadequate cause in killing the deceased, the same was reversible error.

**5.—Same—Charge of Court—Inadequate Cause—Murder in the Second Degree.**

Upon trial for murder where there was no evidence that deceased used objectionable language toward the defendant, it was reversible error in the court's charge to base murder in the second degree upon such contingency.

**6.—Same—Charge of Court—Murder in the Second Degree.**

Upon trial for murder where the court in his charge conjunctively joined immaterial matters and required the jury to believe them before they could find defendant guilty of murder in the second degree, the same was reversible error.

**7.—Same—Murder in the Second Degree—Charge of Court.**

Upon trial for murder where the evidence raised the issue of murder in the second degree, the court erred in not giving a requested instruction to the effect that unless it appeared to the jury from the evidence, beyond a reasonable doubt, that the act of killing deceased was not the result of a sudden, rash and inconsiderate impulse or passion they could not find defendant guilty of murder in the first degree.

**8.—Same—Charge of Court—Murder in the Second Degree.**

Upon trial for murder where the issue was whether the offense was murder in the first or second degree, the court should have given a requested charge that unless the facts and circumstances in evidence proved to the satisfaction of the jury, beyond a reasonable doubt that the killing of the deceased by defendant was of express malice, as defined by the court, they could not find defendant guilty of murder in the first degree.  Brooks, Judge, dissenting.

Appeal from the District Court of Presidio.  Tried below before the Hon. W. C. Douglas.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*P. H. Clarke,* for appellant.—On question of murder in the second degree and plea of guilty: Murray v. State, 1 Texas Crim. App., 417. On question of charge on murder in first and second degree: Tillery v. State, 24 Texas Crim. App., 251; Reynolds v. State, 14 Texas Crim. App., 427; Sanders v. State, 38 Texas Crim. Rep., 343; Conn v. State, 11 Texas Crim. App., 390; Lynch v. State, 24 Texas Crim. App., 350; Foster v. State, 8 Texas Crim. App., 249; Marshall v. State, 40 Texas, 200; Long v. State, 1 Texas Crim. App., 709; Wheeler v. State, 34 Texas Crim. Rep., 350; 30 S. W. Rep., 913; Stuckey v. State, 7 Texas Crim. App., 174; Johnson v. State, 30 Texas Crim. App., 419.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, Judge.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

The facts, in substance, show that deceased and appellant had some character of relationship or cohabitation in Old Mexico, the deceased leaving appellant with the statement that she had some business in court which she had to look after, and finally, in her wanderings, came to Texas, and went to Presidio County. Appellant armed himself with a razor and began to search for deceased, and having traced her to Presidio County, the place of the homicide, and finding she was living at the time with Santos Gonzales, forged a letter of introduction from a friend of Santos Gonzales to Santos Gonzales, recommending appellant to his friendly hospitality. Santos took him home with him on the night of the homicide, the appellant never even suggesting that he was seeking deceased. Santos and appellant arrived home about two o'clock in the morning. Appellant was provided with a cot on the back porch of a one-room house where Santos Gonzales lived, and about daybreak the next morning deceased and a companion, who was living in the small house in the back yard of the main house, got up to drive a hog out of the yard. Appellant hallooed at her, but she did not see nor hear him, and paid no attention to him at all after the hog had been driven out of the yard by her. Returning to the little house where she was sleeping, deceased was seized by appellant, carried up on the gallery where appellant had been sleeping, and there in the most cruel and brutal way she was cut one or more times on the throat, and she was disemboweled by various and sundry deadly gashes with a razor, she screaming for assistance as long as she could. Appellant insists that the reason he killed the deceased was because the deceased told him to let her go, that she had to go and get breakfast for Clemente, and that, when this statement was made; it aroused appellant to great frenzy of jealousy against Clemente, and that that is the reason he killed her.

Appellant says there was no kinship or relationship between himself and the deceased. The evidence suggests in all of its phases a malignant seeking out by appellant of the deceased with the settled purpose to kill her because she had ran away from the Republic of Mexico and come to Texas.

The appellant complains the court erred in charging on murder in the second degree. Appellant does not insist upon the issue of manslaughter in his motion for a new trial. The court, after defining what is murder in the second degree, and applying the law of said degree, gave the following as an additional charge upon said degree to the jury: "If you believe from the evidence that the defendant came to Marfa for the purpose of inducing Dolores Moreno to return with him to Ciudad Porfirio Diaz, Mexico, by persuasion, and that, while talking to said Dolores Moreno with that purpose, if you find such was his purpose, the deceased Dolores Moreno used objectionable or offending language to the defendant, and if you further believe from the evidence that the defendant then and there became angered or enraged, on account of said language, if any, of the deceased at the time, either alone or in connection with other facts or circumstances in evidence, whether such anger or rage, if any, was warranted by the circumstances or not, and that by reason of such anger or rage, if any, the mind of the defendant was not at the time cool, deliberate and sedate, and that in such frame of mind the defendant then and there formed the purpose of cutting the deceased, and then and there executed such purpose, or you have a reasonable doubt thereof, then you are charged that the defendant, if you so find, could not be guilty of any higher grade of offense than murder in the second degree, and you will acquit him of murder in the first degree." The charge certainly was very favorable to appellant, since it leaves the jury the right to find appellant guilty of murder in the second degree from the sheer fact that his mind was not cool and dispassionate. One may commit murder without being absolutely cool, deliberate and sedate. It is true these are elements of murder in the second degree, but it does not necessarily follow that, because a mind is not cool, deliberate and sedate, that it is not murder in the first degree. Evidently, from the evidence in this case, the appellant's mind was enraged at deceased, which anger had settled into a deep conviction of hatred and design to kill, but such anger would not preclude a verdict of death, as the jury gave appellant in this case.

Appellant tendered the court the following special charge: "Gentlemen of the jury: You are instructed by the court that, unless you find from the evidence, beyond a reasonable doubt, that the design of defendant to kill the deceased had not its first inception and origin in an inflamed and excited mind, incapable of such sedate, deliberate action as is essential to express malice; or unless, if such design had its first origin in said inflamed, excited condition of mind (if any), as above explained, you should find there was cooling time for passion (if any)

before the killing of deceased, then the killing, no matter how such passion or excitement arose, can not be found by you to be murder in the first degree." There was no error in the court refusing to give this charge. It does not present in any aspect the law in any case. The first clause says "that, unless you find from the evidence, beyond a reasonable doubt, that the design of defendant to kill the deceased had not its first inception and origin in an inflamed and excited mind," etc. We presume appellant meant to say, in his charge, if it did have its first inception. Certainly, if it did not have its first inception in an inflamed and excited mind, but had a cool and deliberate purpose back of it, it could never subsequently have reached murder in the second degree or manslaughter. We deem it unnecessary to further discuss said charge.

Special charge No. 2 asked by appellant is as follows: "You are instructed by the court that unless it appear to your satisfaction, from the evidence, beyond a reasonable doubt, that the act of killing deceased was not the result of a sudden, rash and inconsiderate impulse or passion, you can not find that defendant is guilty of murder in the first degree." This charge is not the law of this case, and there is nothing in the evidence suggesting it.

Special charge No. 3, asked by appellant, is as follows: "You are instructed by the court that unless the facts and circumstances in evidence before you prove to your satisfaction, beyond a reasonable doubt, that the killing of deceased by defendant was of express malice (as already in the main charge defined to you) you will not find defendant guilty of murder in the first degree." This charge was in substance covered by the main charge.

We have discussed all of appellant's assignments of error in this record and must say that there is no error to be found in same. The evidence shows a deep seated hatred and premeditated design to pursue with relentless hate the helpless victim of .appellant's wrath, which pursuit terminated in the murder and brutal killing of deceased. This being true, we do not believe the jury could rationally have come to any other conclusion than that the appellant with cool and deliberate mind and formed design took the life of the deceased, and, therefore, we think the verdict of the jury was amply warranted by the evidence.

The judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### June 9, 1909.

RAMSEY, JUDGE.—When this case was submitted originally there was no appearance made or brief filed on behalf of appellant, due, as we understand, to the fact that the case was submitted earlier than had been anticipated. In view of the fact that the death penalty was assessed, the court invited argument on behalf of appellant, which was

responded to and the case presented in his behalf with great force and ability. On further reflection the majority of the court have become convinced that there was error in the charge of the court hurtful to appellant for which the case should be reversed. To the end that the opinion may well be understood we now make a fuller statement of the case than was made in the original opinion. The appellant, Jose Cordono, and the deceased, Dolores Moreno, up to the 21st day of May, 1908, had been living in the town of Ciudad Porfirio Diaz, in the Republic of Mexico, and to all outward appearances in very intimate relations. About the 21st day of May, 1908, for some reason not definitely disclosed by the statement of facts the deceased left Diaz and as early as a week or ten days before her death was discovered to have been in the town of Sanderson, and about a week before the 12th day of August, 1908, came to the town of Marfa, Presidio County, with one Clemente de los Santos, where they lived and stayed together in a house on the premises of one Santos Gonzales. The testimony of this last named witness was to the effect that Clemente and Dolores had been at his place about a week before appellant arrived, and on the night of August 11, appellant came in on the train which reached Marfa evidently about midnight, or a trifle later. About this time on that night appellant made inquiry for Santos Gonzales and spoke to him and said he had a letter of recommendation to him. He showed the letter to Gonzales, who, it seems, however, was not able to read, but appellant said nothing further after showing the letter except to say that he had been recommended to him by Yeno Marcos; that about 2 o'clock on that morning they went to Gonzales' house; that appellant stated no purpose in going with him except that he had been recommended to go there. The house of Gonzales fronted north, and while perhaps not necessary, to insure accuracy we here make a plat of the premises, as follows:

## NORTH

A—Front door of family residence, the room occupied by Gonzales and family.

B—Back door opening on porch.

C—Position of defendant's cot on porch.

D—Place where Dolores Moreno was seen lying by witnesses.

E—Door of room occupied by deceased and Clemente, out of which deceased came to drive away hog, and in which defendant says he saw Clemente standing.

He further states that Clemente and Dolores were in their room on that night; that they, Gonzales and his wife, furnished appellant a cot to sleep on which was placed on the back gallery by his wife. Gonzales says that after retiring for the night he was awakened by a scream from this woman; that he did not hear what she said but barely heard the sound of her voice; that thus alarmed, he pulled the door open and saw the woman Dolores lying down and appellant standing up with a razor in his hand; that he went immediately to see Mr. Wilcox, who it seems was an officer, and in the meantime sent one of his children after Doctor Mahon; that on his return he dis-

covered that Dolores had one wound on her throat and another across
the stomach extending clear across the abdomen; that on his return
appellant was on the outside of the inclosure walking up and down;
that he had blood on his hands at the time; that when appellant
first came to Marfa he had nothing with him except a letter—that is,
he had no satchel, no valise, or anything of that character. Clemente
de los Santos was introduced, who testified that when Dolores was
killed he had been at Marfa some four or five days; that she had
come with him to Marfa from Sanderson and was living with him in
this room on the premises of Gonzales; that he never saw anything
of Dolores before she was killed, only she got up and went out of the
room which she and witness were occupying to scare a hog off of the
premises; that in going out she closed the door; that the next · thing
that he heard was two cries; that when he opened the door and looked
out he saw a man standing by her; that this man was appellant and
that Dolores was lying on the porch floor, defendant standing over
her with a razor in his hand and looked as if he was wiping it; that
he, witness, immediately went to get an officer; that Dolores was out
of the house some five or six minutes before he heard a cry, and that
in the meantime he had dozed off to sleep. Doctor Mahon, whose
skill as a physician was admitted, testified that he was called to see
Dolores about 6:30 in the morning, and found her lying as described
by the other witnesses and wounded practically as stated by Gonzales,
except he further stated that there were two deep wounds across her
hands; that he found both the large and small intestines were out
and cut in two; that he made examination of the intestines and that
in his opinion they were not all cut in line with the wound across
the abdomen, but he believed there were other wounds in addition
to the one that made the opening. G. T. Wilcox was also produced,
who testified to the effect that he was deputy sheriff and that Gonzales
had called for him on the morning in question, and he went at once
to his, Gonzales', place, where he arrested appellant as he walked
from the gate in the direction of a saloon across the street; that he
did not at this time have a razor on him, but he found it on the
gallery; that at the time both of appellant's hands were bloody up
to the wrist. He went into some detail as to the desperately wounded
condition of Dolores, and said that she stated that she was going to
die; that he told her that he did not think she was going to die;
that he thought so but did not want to tell her so, but that she
stated that her bowels had been cut out and that the man grabbed
them in his hand and slashed them up with a razor, and she was
going to die. This witness identified the letter of recommendation
referred to by Gonzales, which will hereafter appear; that soon after
he arrested appellant, Clemente walked up and appellant abused him
in Mexican and said he ought to have killed him, just as he had
the woman; that appellant made no effort to escape. This witness
testified that there were two wounds on the throat of deceased and

one on the stomach. This was all the testimony offered for the State. Appellant became a witness in his own behalf and testified in substance that he lived at C. P. Diaz, in Mexico, where he had resided since April, 1907; that he was thirty-nine years of age and had lived in the Republic of Mexico all of his life; that he had known deceased and lived with her since April, 1907; that he left Diaz on the 11th of August, which was the day before Dolores was killed, going to Sanderson; that his reason for going to Sanderson was to see Dolores; that she had asked for permission to go to Brackett, which was a town off of the railroad and some distance from Sanderson, and in about six days after she wrote him from Sanderson, and he had gone up to see about it; that not finding her at Sanderson he went to where Yeno Marcos lived, and from Sanderson he came to Marfa; that he went, on his arrival at Marfa, to the house of Gonzales, having met him at a house where there was music; that his purpose in going to see the woman was to see what business she had in court and then take her back to Mexico; that on meeting Gonzales he told him that he had a letter of recommendation, and also that he wanted a place to stay; that Santos Gonzales took him home with him and his, Gonzales', wife selected the place where he was to sleep and fixed a cot for him; that the first time that he knew that Dolores Moreno was at the house of Santos Gonzales was next morning; that no one had told him before that she was at the house of Gonzales and that he made no inquiry either of Gonzales or any of his family. He states the circumstances of the death in these words: "When I woke up, I sat down on the side of my cot. After that I saw Dolores look out from a door, probably where she was living; she talked but I could not articulate what she said, but supposed she was talking to someone she was staying with in the room, and she come out, I suppose to scare a hog away out of the garden. At the time she went to run the hog out, I was sitting on the side of the cot, and spoke to her; probably she didn't hear me, as she didn't answer or look around where I was, and then I got up and went to a place to wait for her as she come around by the house. When she met me, she acted as if she was excited, and asked me what I was doing there. I answered, what do you suppose I am doing here. I said I was traveling around on account of you; in your letters to me you told me that you was tangled up in the courts, and I have come to see, and then I told her to come on and go with me, and she come on and we sit on the side of the cot where I had been sleeping. Then she told me after a little while to let her go; that she had to go and get breakfast for Clemente. Right then that angered me, and I looked over and saw this man standing up with his hands on the door facing, and I flew into passion; it was jealousy in my heart; after that I proceeded to do what I am accused of. I was very much impassioned, and through jealousy and seeing the man, I did the act at the time she spoke to me about

having to go cook breakfast for this man, and I saw the man stand-
ing there, jealousy flew over me. This remark caused me my first
intention of injuring Dolores Moreno; when she said she had to go
and cook breakfast for Clemente, and I saw Clemente standing
there. These words angered me in a sentimental way and raised
my jealousy; seeing what I had seen and become excited with the
words she had spoken to me. In a moment after I was very sorry
for what I did." On cross-examination his testimony was but slightly
shaken, if at all. The letter to which he refers in his testimony is
as follows:

"Sanderson, Texas, August 12, 1908.
"Sr. Santos Gonzales:
"My esteemed friend, I will be well pleased at your receiving this
that it will find you and your esteemed family in good health. Our
health remains good thanks to the Lord. After saluting you I will
tell you to do me a favor to tell the man that has this letter where
is the woman Clemente de los Santos brought to Marfa. This man
is her brother, and I recommend him to your favors, and await ex-
pecting you to respect it as the friend that I am.
"I am your friend and affectionate servant,
"Yeno Marcos."

He explains that the reason why he stated that Dolores was his
sister was that he did not want her to know he was coming; that
she might hide. He also states that he wrote this letter and that
Yeno Marcos signed it, and that Yeno Marcos suggested it. He
also states that Santos was a very special friend of Yeno Marcos, and
he put it in there that Dolores was his sister so that Santos would
take more interest in it; that they had told him that Clemente de los
Santos was the name of the man that had come up on the train, but
that he did not know it was the same Clemente de los Santos whom
he knew in Mexico. He says further, that he brought the razor with
him, but that he left the rest of his things and a basket of fruit at
Marcos. On cross-examination he makes the following additional
statements in respect to the circumstances of the killing: "She was
sitting on the cot. I did not say that she had got up. She asked
me to let her go cook breakfast. She said I am going; I have to go
and cook breakfast for Clemente. No, I didn't grab her then. I
told her she could go directly. Yes, I immediately got my razor.
Yes, I immediately began to cut the woman. In that moment I could
not tell whether I first tried to cut her throat or not. I was out of
my own reason and I don't know what she said. Possibly she did
grab the razor in making her defense. She made a defense. She
put her hands up in my way. Yes, with her hands up like that
(indicating by raising hands) I continued to cut her with that razor.
No, I didn't cut her twice in the throat. I cut her one time in the

throat. She didn't have her hands up about her throat at that moment. I don't know which place I cut her. I cut her across the stomach. No, when the entrails rolled out I did not cut them several times with the razor. It appears to me I laid the razor on a chair. Yes, I cut myself on the fingers. No, I didn't cut the other hand. I was in a rage. I started in evidently to kill the woman. I didn't take any precaution to know whether she was dead or not. Yes, I thought the wounds were sufficient to kill the woman; that is the reason I stopped. Yes, I walked out into the street. Yes, both of my hands were bloody up to the wristbands. I got them bloody laying her out and fixing her clothes. Yes, I had presence of mind enough then to lay her out and arrange her clothes properly; it was with repentance I took interest in putting her in as good position as I could. I had profound pity for the act that I had done. I had disposed of the knife; put it on a chair or dropped it. Yes, that cut on the finger is the only cut I got. Yes, I went out in the street. Yes, and Mr. Wilcox come up. First walked out in the street, and some man come and I told him to get away from there; that I was a criminal; then I went back and saw Mr. Wilcox and some others."

Santos Gonzales was recalled by defendant and testified that he did not, nor did anybody else in his hearing tell appellant who was in his house on the night that he came there; that he did not tell appellant that Dolores was in his house, or that anyone else was in the house; that he had no conversation with appellant as to where Dolores Moreno was. He further said, that Clemente de los Santos generally stopped at his house, but he did not know whether he knew Yeno Marcos or not. He also stated that Clemente had stopped at his house only once before this, about a year before. During the trial appellant's effects were examined and were found to contain, among other things, a glass and some powder, a shaving brush and another razor. Among the belongings appellant identified a lock of Dolores' hair and a jacket and stockings belonging to her which he said were bundled up and brought by mistake. The bundle also contained certain other articles of clothing belonging to appellant. This is the case and the whole case.

On the trial there was the unusual spectacle of a straight, clear plea of guilty. There was no pretense in the way of self-defense nor any claim of insanity. Horrible as the deed was, appellant, with unflinching courage, met his fate squarely. The court below charged on both murder in the first degree and murder in the second degree. If murder in the second degree was in the case, there can be no doubt, nor is it a matter of serious dispute among us, that the case should be reversed, because it will be demonstrated that the charge on murder in the second degree is undoubtedly erroneous, misleading and prejudicial. The only controverted issue in the court below was this: Was the murder admitted, murder in the first degree or murder

in the second degree? Aside from the sickening details of the murder upon which the jury might readily infer express malice, all the other indicia in the case, indicates to us murder in the second degree. Recognizing, of course, differences of opinion our own judgment is that the testimony tended rather to sustain murder in the second degree than murder in the first degree. These facts, if we may believe the testimony, are undoubtedly true: That appellant, when he went to the residence of Gonzales, did not know that Dolores Moreno was there. He testifies that he did not know this; Gonzales testifies that no inquiry was made and that he did not tell appellant that she was there, nor did anyone else tell him that she was there. The letter which he bore from Marcos to Gonzales asking Gonzales' aid in locating her, rather implied that he might have some difficulty in finding her and that the aid of a resident of Marfa might be needed in the search. It is undoubted that the appearance of Dolores in the yard at the time she came out was unexpected to appellant, unexpected to her and unexpected by everyone else. The meeting at the time and place was wholly unexpected to both of them. His testimony clearly raised the issue of sudden impulse of jealousy such as marked Othello and led him to exclaim in a speech of surpassing eloquence, and to speak of himself as

> "Of one that lov'd not wisely, but too well;
> Of one, not easily jealous, but, being wrought,
> Perplex'd in the extreme; of one, whose hand,
> Like the base Indian, threw a pearl away,
> Richer than all his tribe."

We can well imagine that having in mind what their relations had been in his own country, where more license is allowed than with us, and where the hot- blood of the Latin race courses more swiftly through the veins, that what he says may be true when he states that, "these words angered me in a sentimental way and raised my jealousy; seeing what I had seen and become excited with the words she had spoken to me, and in a moment afterwards I was sorry for what I had done." In any event, whatever might be our own opinion, that the issue of an accidental meeting and a killing on a sudden transport of frenzy and jealousy was in the case is to our minds demonstrable. If this were true, it was, in view of his plea of guilty, indispensable that the court should charge the law of murder in the second degree correctly. This, we believe, the court below did not do. The only charge given by the court submitting affirmatively the issue of murder in the second degree, was the 16th paragraph thereof, which is as follows: "If you believe from the evidence that the defendant came to Marfa for the purpose of inducing Dolores Moreno to return with him to Ciudad Porfirio Diaz, Mexico, by persuasion, and that while talking to said Dolores Moreno with that pur-

pose, if you find such was his purpose, the deceased, Dolores Moreno, used objectionable or offending language to the defendant, and if you further believe from the evidence that the defendant then and there became angered or enraged, on account of said language, if any, of the deceased at the time, either alone or in connection with other facts, or circumstances in evidence, whether such anger or rage, if any, was warranted by the circumstances or not, and that by reason of·such anger or rage, if any, the mind of the defendant was not at the time cool, deliberate and sedate, and that in such frame of mind the defendant then and there formed the purpose of cutting the deceased, and then and there executed such purpose, if you have a reasonable doubt thereof, then you are charged that the defendant, if you so find, could not be guilty of any higher grade of offense than murder in the second degree and you will acquit him of murder in the first degree." This charge was excepted to and it is claimed to be erroneous for the following reasons: "Said instruction erroneously directs the jury, among other things, in effect, that to reduce the offense to murder in the second degree they must find the particular intent or· purpose with which defendant came to Marfa; and that it was to induce Dolores Moreno, deceased, to return with him to Ciudad Porfirio Diaz, by persuasion, which placed on defendant the burden and danger of an immaterial issue; made his veracity in testifying in this particular before the jury a condition necessary to the reduction of his offense below murder of the first degree, and was a charge on the weight of the evidence. Second. Said instruction, purporting to group the facts in evidence against express malice, requires the finding conjunctively of immaterial issues, to wit: the said purpose of defendant in coming to Marfa, and that deceased used objectionable language to the defendant; and that it was on account of said language, if any, of deceased at this time, either alone or in connection with other facts and circumstances in evidence, that defendant became angered or enraged, if so he became; and that it was by reason of such anger or rage, if any, the mind of the defendant was not at the time cool, deliberate, and sedate, and the said grouping is not a full or correct grouping of all the facts in evidence in favor of the lesser degree of guilt, and is not a fair presentation of the facts relied on or calculated to reduce guilt to the second degree and gives undue prominence to particular facts and circumstances, and erroneously makes anger or rage the only mental excitement available to defendant in reduction of degree of guilt while the evidence developes other passions eclipsing to defendant's mind, and affecting the legal quality of the acts charged against him, and his degree of guilt; and further erroneously requires that said particular species of mental excitement limited in said charge, must arise and have its origin in or exist on account of objectionable or offending language of deceased, of which there is no evidence, either alone or in connection with other facts and circumstances in evidence, in

order that the jury might acquit the defendant of murder in the first degree, while the only material inquiry is passion or mental excitement vel non, such as would present cool, deliberate or sedate mind regardless of kind of passion or excitement or its particular cause, and the effect of said error was to unduly and indeed wholly deprive defendant of the benefit of mitigating evidence as to degree of guilt, such as disappointed infatuation for deceased and jealousy aroused at his sight and her proclaimed attention to Clemente de los Santos." We agree with counsel that this instruction was erroneous in that the immaterial matters were conjunctively joined and the jury required to believe them before they could find appellant guilty of murder in the second degree. It is immaterial in order to reduce the offense to murder in the second degree, what was the intent for which appellant came to Marfa, provided it was not his intent and purpose to slay deceased, nor was it important that it was his · purpose to return to Diaz and induce the deceased to return with him. It is also objectionable in the joining of these immaterial matters that the further fact was required to be found that the deceased used objectionable language to appellant and that he, on account of such language, became angered or enraged. There was, in fact, no objectionable language in the sense in which the jury would understand that term, and the grouping of these matters gives undue prominence to particular facts and circumstances, and erroneously makes anger and rage the only mental excitement available to appellant in the reduction of the degree of guilt, and that such rage and anger must have its origin in and exist on account of the objectionable and offending language of the deceased. We think, too, in view of the facts that the court should have given in charge to the jury the second special instruction requested by appellant, which is as follows: "You are instructed by the court that unless it appear to your satisfaction, from the evidence, beyond a reasonable doubt that the act of killing deceased was not the result of a sudden, rash and inconsiderate impulse or passion, you can not find that defendant is guilty of murder in the first degree." We think, too, the court should have given the third special instruction requested by counsel for appellant. This instruction is as follows: "You are instructed by the court that unless the facts and circumstances in evidence before you prove to your satisfaction, beyond a reasonable doubt that the killing of deceased by defendant was of express malice (as already in the main charge defined to you) you will not find defendant guilty of murder in the first degree." The only charge given by the court in respect to this matter was the usual charge that if the jury have a reasonable doubt as to whether defendant is guilty of murder in the first degree or murder in the second degree, they would give appellant the benefit of the doubt and find him guilty of murder in the second degree.

Believing that, as applied to the facts of this case, the appellant

has not received a fair and impartial trial under the law, and that the motion challenging the original opinion of the court is correct, the motion for rehearing is hereby granted, the judgment of conviction set aside and reversed and the cause remanded for a trial in accordance with the law.

*Reversed and remanded.*

BROOKS, JUDGE, dissents.